# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 17, 2005 Session

## ANTHONY CHATMAN v. CITY OF CHATTANOOGA

**Appeal from the Chancery Court for Hamilton County**
**No. 04-0186     Frank R. Brown, III, Chancellor**

**No. E2004-02701-COA-R3-CV - FILED JANUARY 5, 2006**

Mr. Chatman was a policeman in Chattanooga.  He was fired on September 15, 2003 for untruthfulness during an investigation, and for conduct unbecoming a police officer.  He appealed to the Chattanooga City Council which upheld his dismissal.  His petition for certiorari was denied and he appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D.  MICHAEL SWINEY, JJ., joined.

Anthony Chatman, *Pro Se.*

Ann K. Shaffer, Chattanooga, Tennessee, for appellee, City of Chattanooga.

## OPINION

Mr. Chatman was assigned to Howard High School [hereinafter "Howard"] as a School Resource Officer.  His conduct at the school lies at the core of this matter which was initially investigated by Internal Affairs officers, and resulted in a further investigation and hearing by the Chief of Police, who terminated Mr. Chatman.  His appeal to the Chattanooga City Council was heard by a committee of three members who conducted a plenary hearing and upheld Mr. Chatman's termination.

J. C., who played softball for Howard, testified that Mr. Chatman, on an unspecified occasion, jumped a fence and grabbed her buttocks, telling her that she was "supposed to catch these balls."  Her sister, A. C., a junior at the high school, testified that she had a tattoo on her arm, that Mr. Chatman touched her and asked why she did not put his name on the tattoo.  He would on occasion see her in the hall and hug her.  She testified that she tried to avoid Mr. Chatman.

Sgt. Danna Vaughn, Mr. Chatman's superior officer in the SRO program, testified that Mr. Chatman was transferred from Dalewood Middle School [hereinafter "Dalewood"] to Howard during the middle of the 2002-2003 school year because of a number of rumors about misbehavior on Mr. Chatman's part. She further testified that she personally told Mr. Chatman that he needed to keep his mouth shut and his hands to himself.

Sgt. Vaughn talked to a number of female softball players, who related certain incidents involving Mr. Chatman. The word used to describe him was "pervert" and the students said they tried to avoid him. As a result of this discussion, Sgt. Vaughn went to Howard and talked with assistant principals Layne and Hargrove, and then Assistant Chief Cooke. An investigation was begun the next day by Sgt. William Kenneth Neblette.

Sgt. Vaughn believed Mr. Chatman had been untruthful to her when he requested leave time, and that he violated department policy when he drove some students to a STARS program in his police car. He had earlier violated the same policy while working at Dalewood.

Patty Layne, an assistant principal at Howard, testified that there were three or four girls who were often at Mr. Chatman's office. His pass-writing privileges were terminated because he would write the girls a pass (excused absence) when they were scheduled to be in class.

Ms. Layne related complaints to her by female students about Mr. Chatman touching them, hugging them and getting too close ("invading their space"). She also heard complaints that Mr. Chatman told one female student she could "pee" in his pocket. Ms. Layne testified she warned Mr. Chatman two or three times about such conduct and then reported him to the principal.

Dorothy Stubsten, a teacher, testified that during a playful exchange in the presence of Mr. Chatman and students, she said she was going to "serve" him, *i.e.,* give him a knuckle sandwich. As she walked away Mr. Chatman touched her arm, put his lips close enough to her that his lips touched her ear, and said "Don't make any promises you're not going to keep." On another occasion she was walking slower than he was as they walked to his car. He was going to get money for her so she could buy his lunch as she was designated for lunch pick up that day. He told her to catch up, *i.e.,* "Come on up here, I don't bite. I nibble sometimes, but I don't bite."

On another occasion Ms. Stubsten and Ms. Cassy Bristol were leaving together to get lunches. One asked him if they could get him something: He replied that lunch was not what he wanted. Ms. Stubsen stated Mr. Chatman's words and conduct were offensive and made her very uncomfortable.

Cassy Bristol, a teacher, and the softball coach, testified that a student complained to her that Mr. Chatman has rubbed his hand down her back. On another occasion Ms. Bristol was standing in the hall with her hands in her pockets when Mr. Chatman approached and said either that he wished he were her hands or that he wished his hands were in her pockets. On another occasion, Mr. Chatman told Ms. Bristol that she must be stressed. He then put his hand inside her blouse and

touched her right shoulder. Ms. Bristol stated that there were always girls in his office, especially three in particular. He told one girl he would like to tuck her shirt into her pants.

Stacy Coleman, the attendance secretary at Howard testified that there were girls in Mr. Chatman's office some of whom were reported absent because they were in Mr. Chatman's office instead of attending the assigned class. Ms. Coleman's office adjoins Mr. Chatman's and because the wall did not touch the ceiling she could hear talk from his office. On one occasion a female student asked him about the number of children he had. When he said four, the student said "you must be getting down with your wife [*i.e.,*, having sex a lot.]. Ms. Coleman was upset that Mr. Chatman never reprimanded the child for that comment, or asked her to leave his office.

Julius Hargrove, another assistant principal, testified that he heard of an incident during which Mr. Chatman told a student to pee in his pocket, and that he talked with Mr. Chatman "man-to-man" about that incident. Mr. Hargrove said that young ladies were always in Chatman's room.

Sgt. Neblette described his investigation and findings. One incident involved a female student drafting a paper on Mr. Chatman's computer. She wrote that, as a young child, she once got sick from drinking spoiled milk, which resulted in making "her bottom raw." Mr. Chatman looked over her shoulder, read this part, and asked her if it was still raw. Sgt. Neblette asked Mr. Chatman about the incidents reported in his IAD report. Mr. Chatman denied every allegation/incident except he did admit patting his pocket when a female student asked to be excused while he was presenting a class on date rape. He also admitted telling a female student to go into his office to tuck her shirttail into her pants, explaining that he had earlier told her to tuck the shirttail in but she had not done so. As a result of Sgt. Neblett's investigation, Mr. Chatman was officially charged with conduct unbecoming an officer and being untruthful during the investigation, *i.e.*, denying everything.

Jimmy L. Dodson, the chief of police, testified that hearing the witnesses testify live before the Committee of the City Council, as opposed to reading reports, made him more certain that Mr. Chatman's termination was correct. Mr. Chatman had been suspended twice previously, once for three days and once for fifteen days.

Mr. Chatman testified and also presented six witnesses on his behalf. Bobbie Bryant testified about being in a prayer group with Mr. and Mrs. Chatman. She had no knowledge about his duties as a SRO or at Howard. Marvin Lott was a principal at Dalewood while Mr. Chatman was there as a SRO. He knew of no inappropriate touching or talking by Mr. Chatman at Dalewood. David Collins, the bookkeeper at Dalewood, testified that he did not notice any inappropriate talking to or touching of females by Mr. Chatman at Dalewood.

Mr. Chatman presented two witnesses who worked with him at Howard. Helen Jones, a receptionist, testified that she did not see him act inappropriately to females, that he acted in a professional manner and was energetic and a quick responder.

Richard Morris knew Mr. Chatman through their ministry as well as Howard School. He described Mr. Chatman as a fatherly figure and said he put his arms around the kids in a fatherly, not sexual, manner. Mr. Morris said both girls and boys were seen hanging out at Mr. Chatman's office. Mr. Morris did state that there was a "buzzing around the school" about Mr. Chatman and the adults also talked about him. Mr. Morris also observed that Mr. Chatman's door was closed while students were in his office. Mr. Morris said students would go to his office "[a]s a way to skip [class]."

Mr. Chatman denied hanging out with the female students. He denied ever closing the door when students were present. He denied grabbing J. C.'s buttocks. He explained the patting of his pocket (for a place to urinate) as an example of poor judgment and poor humor based upon his service in the military. He denied making any statements about urination and claims such an event occurred only once, not twice. Mr. Chatman denied "dirty dancing" and the incidents with Ms. Stubsten. He also denied the "raw bottom" comment. He denied that Sgt. Vaughn had previously warned him and stated that he did not know why he had been transferred from Dalewood to Howard.

The foregoing is a synopsis of the evidence heard by the Committee of the City Council. The members' comments were recorded. Councilman Benson spoke:

> Now, this is not like somebody with a record that's a flawless record. He's had a record continuous with this manifestation of integrity problems and it's finally gotten to the point here that I think the predominance of the evidence that strongly indicates unbecoming conduct for a police officer and/or schoolteacher and this conduct especially includes what Captain Bodkin pointed out, it's his lack of veracity that's necessary for a police officer. And so I see an absence of motivation for anyone else – for all these people to be lying, but I do see a motivation for a police officer here to continue with the same character trait problem that he demonstrated five years ago and I think it's sad. We should have been able – all of us, church, community and others and himself to work on that character flaw because he's got real good potential and I do think it's a shame that this crescendo to that point tonight where his performance is no longer acceptable by the police department.

Thereafter, Mr. Benson made a Motion to uphold Mr. Chatman's termination. Mr. Page seconded the motion, and then summarized his own position as follows:

> [B]ut the overwhelming statement is if you look at this situation on a ledger basis, you've got ten people on one side saying these things happened and on the other side you've got the defendant saying it didn't happen and even the character witnesses, if you will, they were not there at the time. And Dr. Lott, you know, was actually before your experience at the Howard School, so I didn't see anybody, any witness saying these things did not happen that were actually there. There were many witnesses that said it did happen. So I have to second the motion and say that the school and the police department is doing the most appropriate thing.

-4-

John "Duke" Franklin, Jr., the third member of the hearing committee, knew Mr. Chatman personally, and summed up his position as follows:

> We sat here this evening and listened to 11 or 12 witnesses presented by the administration and other witnesses who – the defense side who can testify to a lot of the good things that he's done and I could probably testify to some things to his defense as well; however, at Howard High School we have many, many reports of different instances by people who have nothing to gain. But I think the most compelling evidence is those students. And grant you, I'm just as quick to hug somebody, a young person, girl, whether it be female as anybody else and I understand that that could be misinterpreted, I understand that.
>
> But in this particular case, it just – it just really tears me apart to have to confirm the decision of my colleagues, but in this particular case it's just hard to deny all the evidence that we've been presented here. But at this particular point I would have to concur with my colleagues at this particular time that we must at this particular time uphold the administration's decision.

Thereafter, the Council Committee voted unanimously to uphold the termination of Mr. Chatman as an employee of the Police Department.

The trial judge held that the committee's actions were not "arbitrary or capricious," and that "there is substantial and material evidence to support the decision of the committee of the City Council." He thereupon denied the writ of certiorari.

## Issues

Mr. Chatman appeals and presents for review these issues as we perceive them:

1.      Whether the City Council of Chattanooga could lawfully authorize three of its member to act for it;

2.      Whether the Council acted arbitrarily or capriciously and whether its action was supported by material evidence.

## Discussion

Issue 1.

The City Council of Chattanooga is composed of nine members. Mr. Chatman argues that a quorum - five-members - was required to act against him. He overlooks the amendments to the municipal charter which allows a committee of three council members to hear and decide council appeals, as was done in this case.

Issue 2.

The Chancellor complied with the provisions of Tenn. Code Ann. § 4-5-322 and made findings of fact that Mr. Chatman was terminated for conduct unbecoming to a police officer, and for untruthfulness, as set forth herein. We review the record to determine if the findings of fact and conclusions of law are supported by substantial and material evidence. *Humana of Tennessee v. The Health Facilities Com.*, 551 S.W.2d 664 (Tenn. 1977): *De Priest v. Puett*, 669 S.W.2d 669, (Tenn. Ct. App. 1984; *see, also*, *United Inter-Mountain Tel. Co. v. Public Service Com.*, 555 S.W.2d 389 (Tenn. 1977). The same standard of review imposed on trial courts prevails on the appellate levels. *CF Industries v. Tennessee Public Service Com.*, 599 S.W.2d 536 (Tenn. 1980). Our scope of review is limited to the record, Tenn. Code Ann. § 4-5-322(g), and we determine if the decision of the City Council was (1) made in violation of a constitutional or statutory provision, or (2) in excess of statutory authority, or (3) made upon unlawful procedure, or (4) was arbitrary of capricious, or (5) was unsupported by substantial or material evidence. Tenn. Code Ann. .§ 4-5-322(j). Superimposed is the mandate that we cannot substitute our judgment for that of the City Council.

It is well settled in this jurisdiction that the decision of an agency is not arbitrary or capricious if there is any rational basis for its conclusions. *MobileComm. of Tenn. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 101 (Tenn. Ct. App. 1993). Having carefully considered the record we conclude that the City Council did not act arbitrarily or capriciously, and that its decision is supported by substantial and material evidence. The judgment is affirmed at the costs of the appellant.

_____
WILLIAM H. INMAN, SENIOR JUDGE